UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| AMALIA HARRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  No. 4:10CV1392 RWS |
| | ) |
| CITY OF ST. LOUIS, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Amalia Harris was employed as a Deputy Juror Supervisor in the Missouri Circuit Court's Twenty-Second Judicial Circuit (22nd Judicial Circuit) in the City of St. Louis. Harris was terminated from her position. Harris has asserted age discrimination claims against the 22nd Judicial Circuit and against Defendant City of St. Louis. Defendant 22nd Judicial Circuit, along with the individually named defendants who are employees of 22nd Judicial Circuit, have filed a motion for summary judgment. Because the 22nd Judicial Circuit and its employees are entitled to sovereign immunity, summary judgment will be granted to them on all of Harris' monetary claims. I will also grant the 22nd Judicial Circuit's motion as to Harris's sole remaining claim for injunctive relief in the form of reinstatement because Harris has failed to establish a claim for employment discrimination.

Defendant City of St. Louis has moved for summary judgment on the grounds that it is not Harris's employer. I will grant the City of St. louis summery judgment on that ground.

*Legal Standard*

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998)(citing Fed. R. Civ. P. 56(c)). The party seeking summary judgment bears the

initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Citrate, 477 U.S. 317, 323 (1986). When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof. Id. at 324. In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy. Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

Direct evidence of employment discrimination is rare, therefore, most cases rely on circumstantial evidence. In the absence of direct evidence of discrimination, courts employ the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)(Title VII case).[1]

Under the burden-shifting analysis, the plaintiff must first establish a prima facie case of intentional discrimination. McDonnell Douglas, 411 U.S. at 802; Bashara v. Black Hills Corp., 26 F.3d 820, 823 (8th Cir. 1994). If the plaintiff establishes a prima facie case, a presumption of discrimination is established and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. 411 U.S. at 802. The defendant need not persuade the court that the articulated reason was the basis of the employer's action; rather, it must simply provide some evidence of a non-discriminatory reason or reasons for its action. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993).

Upon the proffer of such evidence, the presumption of discrimination established by the prima

---

[1] See Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1332 (8th Cir. 1996)(applying McDonnell Douglas to an ADEA claim)

facie case "simply drops out of the picture." Id. at 510-11.  The burden then shifts back to the plaintiff to prove that the reason articulated by the employer was really a pretext for discrimination.  Aucutt, 85 F.3d at 1316.  A rejection of the employer's proffered non-discriminatory reason by itself or combined with elements of the prima facie case may be enough to establish, but does not compel, an inference of intentional discrimination.  St. Mary's Honor Center, 509 U.S. at 511.

The burden of proving discrimination remains on the plaintiff at all times.  Id. at 515-16.  It is not enough to merely discredit defendant's articulated reason for the adverse employment action.  A plaintiff must always establish that the real reason for defendant's action was impermissible discrimination.  Id.; see also Huston v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir. 1995).  To avoid summary judgment, a plaintiff must present evidence that, when viewed in its entirety: (1) creates a fact issue as to whether the employer's proffered reason is pretextual, and (2) creates a reasonable inference that a discriminatory motive was a determinative factor in the adverse employment decision.  Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996).

I note that in her brief in opposition to summary judgment Harris cites to panel opinions of the United States Court of Appeals for the Eighth Circuit for the proposition that summary judgment should sparingly be granted in employment discrimination cases and is not proper in very close cases.  The Eighth Circuit, sitting en banc, has rejected applying a more stringent summary judgment standard to employment discrimination cases.  See Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8h Cir. 2011)("The panel statements asserting a different standard of review for summary judgment in employment discrimination cases are contrary to Supreme Court precedent.")

*Background*

Plaintiff Amalia Harris alleges in her complaint that she was employed and paid by Defendant City of St. Louis as an employee of Defendant 22nd Judicial Circuit.  She was terminated from her job

on August 18, 2009, and has sued both Defendants for age discrimination.

Defendant Helen Haskins is the Court Administrator for the 22nd Judicial Circuit.  Defendant Michael Devereaux is the Jury Supervisor for the 22nd Judicial Circuit.  He was Harris' supervisor during the relevant period of this lawsuit.  Defendants Viloa Nance, Paulette Hellon, Claudette Williams, Linda Deschler, and Connie Carson were Harris' co-employees at the 22nd Judicial Circuit.

Plaintiff Harris began her employment with the 22nd Judicial Circuit, in the Jury Supervisor's Office, as a deputy juror supervisor on October 1, 1988.  She was 62 years old at that time.  In February 1995, she was promoted to the position of a Deputy Jury Supervisor upon the recommendation of Devereaux.  Harris performed her job satisfactorily for years.  Some of her annual reviews made a reference to improvement goals.  Her reviews were completed by Devereaux.  Harris' annual performance review in June 1999 noted that she had use 192 hours of sick leave during the review period and stated that Harris should manage her vacation and sick leave better.  (Doc. # 50 Ex. D)  Her annual performance review in October 2004 noted that she used 100 hours of sick leave and stated that she needed to manage her sick leave better.  (Doc. # 50 Ex. E)  Her annual performance review in October 2005 noted that Harris continued to "have a problem arranging her sick leave.  During this period she earned 90 hours and used 98."  (Doc. # 50 Ex. F)  The review stated that she needs to manage her sick leave better.  The review also noted that Harris was "reluctant to question the codings by co-workers even if she thinks they are incorrect."  It stated that "she needs to interact better with her co-workers when coding jury records."  In December 2005, Harris was counseled for being rude to an Asian-American juror.  Devereaux wrote a letter of apology to the juror which included an apology letter from Harris.  (Doc # 50 Ex. G)

### *Harris' altercation with a co-worker*

On February 28, 2006, Harris was in an altercation with her co-worker, Defendant Viloa Nance.

This altercation was precipitated by an incident that happened six-months earlier in July 2005.  In July, Harris had gone down to the Jury Assembly Room and looked at jury questionnaires.  Some of her co-workers thought that she was trying to acquire jury information about a high profile case and give the information to her daughter who worked at a local television station.  Harris states that she was simply trying to identify a couple of co-workers of her daughter's ,who might have been called to jury duty, to say "hello" and maybe have coffee with them.

On February 28, 2006, Harris was asked by Defendant Deputy Jury Supervisor Claudette Williams to go down to the Jury Assembly Room and relieve her co-worker, Dottie Martin for lunch. Harris declined to go because she did not want to be accused of impermissibly going through juror files again.  When Harris declined to go, he co-worker Viola Nance yelled at and physically assaulted Harris.  Nance cursed at her, punched her repeatedly in the chest and shoulder, and forced her to the ground.  Although Williams and another co-worker, Defendant Connie Carson, were in the room during the assault, neither of them intervened to help Harris.

After the assault, Harris called her daughter who came to the Jury Supervisor's Office.  Harris refused to call the police because she believed that Devereaux did not like "confusion in the office" and would not "like it."  When Devereaux returned to the office he talked with all of the workers present and all of them said that they had not seen anything.  Harris thinks that the other women in the Jury Supervisor's Office sided with Nance after the altercation because they were friends with her.

In "Memo for the Record" Devereaux concluded that Harris and Nance got into a heated argument based on Harris' refusal to relieve Martin for lunch. (Doc. # 50 Ex. H)  He noted that Harris says she was hit and pushed by Nance but that other witnesses said that did not occur.  Devereaux determined that Harris' refusal was the catalyst for the work altercation and that such altercations could not be tolerated in the workplace.  He concluded that Harris and Nance could not work together so he

had Harris switch jobs with Charlotte Decker. Although some of her job duties changed, Harris retained the title of Deputy Jury Supervisor and maintained the same pay. Prior to February 28, 2006, Harris was responsible for data entry on requests to be excused from jury service. When Harris switched jobs with Decker, she was responsible for answering the phones, getting the mail and opening it, taking correspondence to and from City Hall, and was responsible for notification postcards. (Doc. # 58 ¶ 131) There is nothing in the record that suggests that Harris' job duties were changed after her altercation with Nance on February 28, 2005 because of her age. Harris' new "day to day" supervisor was Assistant Jury Supervisor Defendant Linda Deschler.

### *Harris' work environment after her altercation with Nance*

Harris went to see her doctor the day after her altercation with Nance. She did not return to work for twenty days until March 20, 2006. Because she had previously used up all of her sick and vacation time, she took the leave without pay. Harris filed a Worker's Compensation claim over the incident and reached a settlement of that claim.

Harris states that after her altercation with Nance, Devereaux asked Harris about the possibility of her retirement. On March 30, 2006, Harris' attorney, Steven Edwards, wrote a letter to the director of the Employment Retirement System to discuss Harris' potential retirement and pension benefits. (Doc. # 50 Ex. C) In the letter, Edwards states that Harris "would very much like to retire..." Harris says that after this letter was sent, Devereaux would constantly ask her about retirement.

Harris testified at her deposition that before her altercation with Nance she got along well with Devereaux and her co-workers and that she never felt like she was discriminated against. (Doc. # 50 Ex. A at 20-21) She stated that after her altercation with Nance she did not feel comfortable around her co-workers. She stated that she felt that she was getting unpopular with her co-workers. She felt she was unpopular based on her decision not to attend birthday parties at work because she did not

want to bring in food anymore for these events.  She also felt unpopular because she declined to go bowling, ice skating, or to the movies with her co-workers.  (Id. at 22)

Over the next three years of her employment Harris believes that she was treated differently by her co-workers than before the incident with Nance.  She said that she was not talked to nicely, and would be cursed at by her immediate supervisor, Linda Deschler, would "get upset at different things and use language, and it would be upsetting" to Harris.  She stated that Deschler would criticize her for being too chatty with the people who came into the office.  (Id. at 22-23)  Devereaux kept asking her about retirement and even "fixed up a deal to send her to a retirement seminar" which Harris declined to attend because she did not wish to retire.  (Id.)

Harris testified at her deposition that she felt her co-workers didn't want her around anymore.  (Id. at 41)  They would whisper and knock things off her desk.  (Id. at 39)  Her co-worker Paulette Helen called her "stupid."  (Id.)  When she went to the lunch room her co-workers would get up and leave.  (Id. at 40)

Harris testified that she believed that her co-workers treated her that way because of her altercation with Nance.  (Id. at 43)  When asked why she thought any of this happened because of her age, she stated that "they probably thought I was just an old lady hanging around or in their way."  (Id. at 44)   Her co-workers made a comment that she did not have a boyfriend which made her feel uncomfortable.  (Id. at 46)  Her co-workers would not say anything to her face but as she went by a worker she had heard "old dog" and a comments that she was "too old to get this and too old to get that and all the other little stuff that goes along with youthfulness of different ones."  (Id. at 47- 48)  Harris believes these comments were made because of the fight she had with Nance.  (Id. at 49) She complained about her co-workers behavior to Devereaux and on some unspecified dates he responded that she should retire because she was she was too old and not enjoying anything.  (Id. at 50)

### *Harris' work performance after her altercation with Nance*

After her altercation with Nance, Harris asserts that she was subjected to unwarranted discipline. She asserts that she was written up for small mistakes that were also made by others but no action was taken against them. (Id. at 61- 70)

On April 6, 2006, Devereaux met with Harris to discuss her attendance record from the year period ending before her altercation with Nance. Devereaux noted in a "Memo for the Record" that he counseled Harris about using 90 hours of sick leave between July 1, 2005 and February 6, 2006. (Doc. # 50 Ex. J)

On May 24, 2006, Harris received a "Corrective Action" memorandum from Devereaux which stated that Harris failed to inform her supervisor of an absence in compliance with Court policy and improperly excused jurors. She was reminded of the proper procedures. (Doc. # 50 Ex. K at 28)

In her August 10, 2006, performance review Devereaux noted that Harris' work was inconsistent. She sometimes improperly coded records, failed to merge records, and she had to frequently be reminded to complete some of her tasks, among other issues. (Id. at 27) On January 19, 2007, Devereaux notified the Court Administrator Helen Haskins of his growing concerns with Harris' job performance and recommended her for discipline. (Id. at 21-23)

On March 2, 2007, Harris was given written notice by Haskins of a possible disciplinary action based on Harris' chronic absences and tardiness; failure to comply with proper work requests by her supervisor; failing to use proper procedures to disqualify jurors; her inability to complete simple tasks; and for behavior which adversely affected the Court. (Id. at 15) (The two weeks Harris was absent from work after her altercation with Nance were not considered as part of the excessive absentee issue.) Haskins noted that Harris had not been responsive to previous corrective action notices and that she may be disciplined up to, and including, dismissal. Haskins met with Harris and her attorney,

Steve Edwards, on March 7, 2007, to discuss these issues. Haskins concluded that Devereaux's concerns of Harris' job performance was well-founded and she imposed a 2-step reduction in pay for six pay periods (from March 18, to June 9, 2007) in an effort to get Harris to improve her job performance. (Doc. # 50 Ex. M)  Harris indicated in the meeting that she felt the complaints about her job performance were motivated by her altercation with Nance and her Worker's Compensation claim. (Id.)

      She believed that her pay was reduced for the six pay periods as a punishment for the fight. ( Doc. # 50 Ex. A at 16)

      Harris' September 1, 2007, performance review noted that she needed to limit her conversations with the public to information regarding jury service, she needed to follow correct procedures for jurors requesting to be excused from service, and continued to have trouble performing some of her postcard notice responsibilities. ((Doc. 50 Ex. N)

      Harris' September 18, 2008, performance review noted that she used a "great deal of sick leave," and she is not receptive to corrections.  The review stated that Harris believes that she is being "singled out unfairly" for poor work but makes the same mistakes repeatedly (coding records, properly document actions, and problems with post card operations).  The review stated that her duties are simple in nature but she "must be watched closely and frequently others must redo her operations." (Doc. # 50 Ex. O) The review concluded that Harris is "eligible for retirement and should give it serious consideration."

      On July 2, 2009, Harris received another negative performance review.  It stated that Harris continued to not follow proper procedure regarding jury excuse requests although she had been counsel many times on proper procedure.  She had problems completing her routine tasks, especially her postcard notice duties.  She was "defensive and argumentative withe her supervisor" and "[s]he makes

inappropriate comments to citizens who call or come to the office for assistance with their jury service." (Doc. # 50 Ex. P)

On July 27, 2009, Devereaux sent a memorandum to Court Administrator Haskins requesting that Harris be dismissed. (Doc. 50 Ex Q) The memorandum made reference to the prior corrective action taken on May 24, 2006 and the disciplinary action taken on March 22, 2007. The document noted that Harris had failed to improve the performance of her duties. It enumerated multiple instances of Harris' failure to follow proper procedures for disqualifying jurors. It also noted six inappropriate comments reported made by Harris to citizens about jury duty, including telling a prospective juror that Judge Clark was "stupid" and that she had received several complaints about the judge. (Id. at 450)

On July 31, 2009, Haskins sent Harris a Notice of Immediate Suspension and Notice of Intent to Dismiss. ((Doc. 50 Ex. R) The Notice restated many of the items from Devereaux's memorandum and noted that her performance problems noted in the previous performance reviews had not been corrected. The Notice stated that Harris would be terminated as of August 7, 2009.[2] Her termination was based on Harris' repeated violations of the 22nd Judicial Circuit's policies and procedures including failure to perform her work satisfactorily, failure to follow reasonable and proper assignments from her supervisor, incompetence, and behavior that adversely affects the court. (Id.)

The 22nd Judicial Circuit did not hire another worker to replace Harris. At the time Harris had her altercation with Nance, none of the employees in the Jury Supervisor's Office were under 40 years of age. Three years later, at the time Harris was fired, the ages of all the office's employees was as follows: one employee was 48, five were in their 50s, and three were in their 60's.[3] Harris was 83 years

---

[2] According to the Complaint, Harris's employment was terminated on August 18, 2009.

[3] Viola Nance was 48, Charlotte Decker was 56, Constance Carson was 50, Claudette Williams was 53, Dorthy Martin was 54, Judy Dombroski was 57, Paulette Hellon was 62, Linda Deschler was 64, and Michael Devereaux was 63.

old when she dismissed from her position.

Harris asserts three claims under Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634. She alleges that she was terminated from her job because of the age, she was subjected to a hostile work environment based on age, and she was fired in retaliation for complaining about age discrimination. Both the 22nd Judicial Circuit and the City of St. Louis have moved for summary judgment on these claims.

*Analysis*

*The 22nd Judicial Circuit is Harris's Employer*

The initial matter I must determine whether the City of St. Louis or the 22nd Judicial Circuit was Harris' employer. That issue is decisive because only Harris' employer can be liable for employment discrimination under the ADEA.

In her complaint, Harris sued both the 22nd Judicial Circuit and the City of St. Louis for employment discrimination. She alleges that she was employed and paid by the City of St. Louis *through* Defendant 22nd Judicial Circuit. The City of St. Louis argues that Harris is not its employee because it did not have any control over Harris to hire, supervise, or fire her. All those powers were vested in Defendant 22nd Judicial Circuit. Harris's claim that the City of St. Louis is her employer is based on the fact that the it provides the funds for the salaries of the Jury Supervisor's Office's employees.

For a defendant to be liable under the ADEA, "'there must be an employment relationship between the plaintiff and the defendant.'" Palmer v. Ark. Council on Econ. Educ., 154 F.3d 892, 895 (8th Cir. 1998) (quoting Deal v. State Farm Cnty. Mut. Ins. Co., 5 F.3d 117, 118 n.2 (5th Cir. 1993)). The ADEA defines an employer as "a person engaged in an industry affecting commerce who has twenty or more employees . . . ." 29 U.S.C. § 630(b). An "employer" also includes, "(1) any agent of

such a person, and (2) a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State." 29 U.S.C. § 630(b).  To show that a defendant institution is an agency of a state or political subdivision of a state for ADEA purposes, a plaintiff must show that the state or political subdivision had some supervisory control over the plaintiff.  Palmer, 154 F.3d at 896 (citing Schaefer v. Transp. Media, Inc., 859 F.2d 1252, 1255 (7th Cir. 1988)).  A plaintiff may demonstrate such control by showing that:

> [T]he terms of employment such as pay, hours, and benefits are fixed by the [state or political subdivision] rather than the [defendant institution]. Other facts . . . would be the source of funds for salaries and wages, whether the employees of the two parties have a common pension fund, and whether the employees are subject to a common civil service employment and grievance policy.

Id. (quoting Rogero v. Noone, 704 F.2d 518, 522 (11th Cir. 1983)); see also Deal, 5 F.3d at 118-19 (applying "hybrid economic realities/common law control test," for which the right to control an employee's conduct is the most important component, but also considering whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment).

It is undisputed that Harris never performed any work for the City of St. Louis.  She was employed by the 22nd Judicial Circuit which had the sole power to hire and fire the employees of the Jury Supervisor's Office.  Employees of the 22nd Circuit and Jury Supervisor's Office are not part of the City of St. Louis' classified civil service employment system.  The 22nd Judicial Circuit's management supervised and controlled the job duties of Harris.  Harris's job performance evaluations and any discipline were the responsibility of 22nd Judicial Circuit management.  The 22nd Judicial Circuit set forth its own policies and procedures.  (Doc. # 53 Def. City's Statement of Undisputed Facts)

The City of St. Louis did not have any of the powers or responsibilities over Harris's terms of employment. Although the City of St. Louis provides funds for the salaries of the employees of the Jury Supervisor's Office, the Jury Supervisor's Office has a distinct classification and compensation system and does its own payroll apart from the City of St Louis. The judges of the 22nd Judicial Circuit decide the number of employee positions in the court, including the Jury Supervisor's Office, and control how to spend the on salaries for those positions. (Id.)

Although the City of St. Louis offers healthcare, worker's compensation insurance, and other benefits to the employees of the Jury Supervisor's Office, the employees' retirement benefits are controlled by the Employees Retirement System of the City of St. Louis. That entity is separate from the City of St. Louis. (Id.)

Based on these factors, I find that the right to control the employment of Harris was overwhelmingly vested in the 22nd Judicial Circuit. The City of St. Louis merely provided funds for salaries and benefits for the employees of the Jury Supervisor's Office. Because the right to control is so substantially vested in the 22nd Judicial Circuit, I conclude that, under the analysis expressed in Palmer, Harris is an employee of the 22nd Judicial Circuit, and not of the City of St. Louis. As a result, I will grant the City of St. Louis's motion for summary judgment because the City of St. Louis is not Harris's employer under the ADEA.

*Eleventh Amendment Immunity for Monetary Damages*

The Eleventh Amendment bars suits in federal court against a state by its own citizens. Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 363 (2001). Eleventh Amendment immunity extends to state agencies which are considered an arm of the State. Gibson v. Arkansas Dept. of Correction, 265 F.3d 718, 720 (8th Cir. 2001). A suit against a state employee in his official capacity is a suit against the State of Missouri. Egerdahl v. Hibbing Community College, 72 F.3d 615,

619 (8th Cir.1995).

Congress did not abrogate Missouri's Eleventh Amendment immunity for claims under the ADEA.  Kimel v. Florida Bd. of Regents, 528 U.S. 62, 91(2000)("The ADEA's purported abrogation of the States' sovereign immunity is accordingly invalid.")  The 22nd Judicial Circuit is an arm of the state and is protected by Eleventh Amendment immunity.  Harris v. Missouri Court of Appeals, Western Dist., 787 F.2d 427, 429 (8th Cir. 1986)(Missouri courts are protected by state immunity under the eleventh amendment.)

Defendant 22nd Judicial Circuit, along with the individually named defendants who are employees of 22nd Judicial Circuit, have filed a motion for summary judgment based on sovereign immunity.  Because the 22nd Judicial Circuit and its employees are entitled to immunity for suit in federal court under the Eleventh Amend, I will grant their motion for summary judgment.

Likewise, the claims against the 22nd Judicial Circuit's employees in their individual capacity will also be dismissed.  There is not any cause of action against supervisors and other employees in their individual capacity under the ADEA.  Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th Cir. 1994).

*Equitable Relief under the ADEA*

Harris also asserts an injunctive claim against Court Administrator Haskins in her official capacity.  She seeks equitable relief in the form of back pay and restitution.  Despite a states's Eleventh Amendment immunity, a claim against a state official in his official capacity for prospective relief is not barred by sovereign immunity.  "The Eleventh Amendment protects a state official sued in his official capacity from all claims except for certain forms of prospective equitable relief, such as reinstatement." Hopkins v. Saunders, 199 F.3d 968, 977 (8th Cir. 1999) (42 U.S.C. §1983 action); See also Gibson v. Arkansas Dept. of Corrections, 265 F.3d 718, 720 (8th Cir. 2001)(Americans with

Disabilities Act (ADA) action).

Although the United States Court of Appeals for the Eighth Circuit has not specifically addressed whether prospective injunctive relief is available under the ADEA, the cases under § 1983 and the ADA strongly suggest such relief is viable.  See Fikse v. State of Iowa Third Judicial District Department of Correctional Services, 633 F. Supp.2d 682, 693 (N.D. Iowa, 2009)(prosepctive injunctive relief available in ADEA action).  However, back pay and front pay awards are barred by the Eleventh Amendment.  See Campbell v. Arkansas Dept. of Correction  155 F.3d 950, 962 (8th Cir. 1998)(front pay) and Barnes v. Bosley, 828 F.2d 1253, 1257 (8th Cir. 1987)(back pay).  As a result, I find that the equitable remedy of reinstatement is be available to Harris.

"The ADEA protects individuals aged 40 and over by prohibiting employers from discharging or otherwise discriminating against such individuals with respect to their compensation, terms, conditions, or privileges of employment on the basis of their age. 29 U.S.C. § 623(a).  In order to prove his claim, [a plaintiff] must show, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action."  Haigh v. Gelita USA, Inc., 632 F.3d 464, 468 (8th Cir. 2011).  Because Harris has not presented evidence of direct discrimination, her claims will be analyzed under the McDonnell Douglas framework.

*Disparate Treatment Claim*

Harris claims she was terminated from her job because of her age.  To establish a prima facie case of age discrimination Harris must show: (1) she was at least 40 years old; (2) she was terminated; (3) she was meeting her employer's reasonable expectations at the time she was terminated; and (4) she was replaced by an individual who was substantially younger.  Id.

Harris cannot establish a prima facie case.  The 22nd Judicial Circuit did not replace Harris with a younger person.  No one was hired to replace Harris  In addition, the evidence also undisputedly

establishes that she was not meeting her employer's reasonable expectations in performing her work. Even presuming that she established a prima facie case, the 22nd Judicial Circuit articulated a legitimate, non-discriminatory reason for Harris's termination based on her job performance. There is no evidence that the 22nd Judicial Circuit's action was a pretext for discrimination or that Harris's age was the "but-for" cause of her termination.

To the extent that Harris claims that her age was the reason her job duties changed and that she received a pay cut for six pay periods, the facts of the case do not support these claims. When Harris was assigned different office duties she retained her job title and pay. The decision to dock her pay was based on her work performance. Moreover, Harris testified at her deposition that she believes these actions were taken as a consequence of her altercation with Nance. Harris also asserts that she was treated differently from her co-workers because she was written-up for mistakes and actions and her co-workers were not written-up for their same actions. However, the record clearly shows that all of Harris's co-workers were over 40 years of age. That is, all of the employees in the Jury Supervisor's Office were in the same protected age group as Harris. She does not have any evidence that she was treated differently than an employee who was not in the protected class, that is under the age of 40.

*Retaliation*

To establish a prima facie case based on retaliation, Harris must show: (1) she engaged in statutorily protected activity; (2) an adverse employment action was taken against her; and (3) a causal connection exists between the two events. Stewart v. Independent School Dist. No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007)(citation and quotation omitted). The Eighth Circuit has held that, generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999).

Harris asserts that she complained to Devereaux about age related comments in the workplace. She asserts that the six pay period reduction in pay a year after her altercation with Nance was in retaliation for her complaints to Devereaux. However, as previously stated, she believes that action was taken as a consequence of her altercation with Nance.

Nor has she presented evidence to support any discipline she received was taken in retaliation of her complaints to Devereaux. She asserts in her response in opposition to summary judgment that she was "fired within months and weeks of filing internal complaints of age discrimination with her supervisor and then his supervisor." (Doc. # 59 at 26). Harris does not identify where in the record these "internal complaints" may be found. Harris also asserts that her counsel sent three letters to Devereaux and Haskins complaining about age discrimination at some unspecified dates between June 16, 2009 and August 4, 2009. Harris does not identify where in the record these letters are located. I do not know where in the record these documents may be found.

It is not a judge's obligation to sift through the voluminous record in a quest to uncover and speculate on evidence of genuine issues of material fact that would defeat a motion for summary judgment. Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996). Moreover, on July 31, 2009, Harris was given written notice that she was to be terminated. Any letters sent by her attorney after that date could not be the basis for a retaliation claim. Base on the record before me, Harris has not established a prima facie claim of retaliation.

Even presuming that she established a prima facie case of retaliation, the 22nd Judicial Circuit articulated a legitimate, non-discriminatory reason for Harris's termination. There is no evidence that the 22nd Judicial Circuit's action was a pretext for retaliation discrimination.

*Hostile Work Environment*

To establish a prima facie claim of hostile work environment, a plaintiff must show (1) that she

belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her membership in a protected group; (4) that the harassment affected a term, condition, or privilege of her employment by creating a hostile work environment; and (5) that the employer knew or should have known about the harassment and failed to take proper remedial action. Cross v. Prairie Meadows Racetrack and Casino, Inc., 615 F.3d 977, 981 (8th Cir. 2010). "Actionable conduct must therefore be extreme rather than merely rude or unpleasant." Id.  In determining whether such a claim is viable, a court should consider "the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the plaintiff's job performance." Id.

      Harris has failed to establish a prima facie claim.  Her allegations about her altercation with Nance, being berated by her supervisor Deschler for mistakes, her change of job duties, being ignored by her co-workers, and having things knocked off her desk are not supported by any evidence that these things happened because of Harris's age.  She expressly stated in her deposition that she believed she became unpopular with her co-workers because of her altercation with Nance.  She has not presented any evidence that her altercation with Nance or the reaction of management to the event was based on age.  She also testified that she believes her job duties were changed based on her altercation with Nance.  None of these events support a age discrimination claim.

      Her testimony that her co-workers sometime made comments under their breath as she passed like "old dog" does not establish conduct that is extreme rather than merely rude or unpleasant. Harris's counsel sent a letter inquiring about retirement after her altercation with Nance.  Devereaux's inquiries about her retirement or stray remarks that she was getting old and should retire also do not support her claim of a hostile work environment. Cox v. Dubuque Bank & Trust Co., 163 F.3d 492, 497 (8th Cir. 1998)(reasonable retirement inquiries do not violate the ADEA);  Ramirez v. Gencorp,

Inc., 196 Fed. Appx. 438, 441 (8th Cir. 2006)(given the evidence regarding employee's poor job performance, the remarks made by a supervisor outside of the decisional process were insufficient without more to generate a genuine issue of fact on the question of pretext), citing Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir.1994) (holding that stray remarks indicating age bias of decisionmaker were insufficient to generate submissible case of pretext in age discrimination case).

Moreover, Haris seeks monetary relief under this claim which is barred under the Eleventh Amendment. She does not seek reinstatement under this claim (which does not appear to be a remedy for this claim). Because she has failed to establish a prima facie case of a hostile work environment and the relief she seks under this claim is unavaialable, I will grant the 22nd Judicial Circuit's motion for summary judgment as to this claim.

As a result of the foregoing, I find that Harris has failed to present evidence that would merit a trial of her age discrimination claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Twenty-Second Judicial Circuit, Michael D. Devereaux, Helen Haskins, Viola Nance, Paulette Hellon, Claudette Williams, Linda Deschler, and Connie Carson's motion for summary judgment [Doc. #48] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant City of St. Louis' motion for summary judgment [Doc. #51] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion to reconsider my order of May 18, 2011, granting the dismissal of her Missouri Human Rights Act claims [Doc. #63] is **DENIED**.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 15th day of March, 2012.